**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        v.<br><br>ERICK LOPEZ FLORES,<br>a/k/a MAYIMBU,<br>                    Defendant. | Case No. 18-cr-10450-MLW-1 |

## SENTENCING MEMORANDUM OF THE UNITED STATES

The United States submits this memorandum to assist the Court in sentencing defendant Erick Lopez Flores a/k/a Mayimbu for racketeering conspiracy in violation of 18 U.S.C. § 1962(d) and for his participation in the horrific, first-degree murder of an innocent teenager named Herson Rivas Sanchez.

Lopez is a long-standing member of the violent, transnational gang known as La Mara Salvatrucha or MS-13—a gang infamous for the brutality and senselessness of its violence. The gang's central organizing principle is violence against those who are deemed to be a threat to the gang. MS-13 members are encouraged to attack—and murder if possible—those believed to be rival gang members and those believed to be cooperating with law enforcement.

By the time of his arrest in 2018, Lopez had spent over a decade bringing MS-13's culture of violence to the streets of Lynn and surrounding communities in Massachusetts. Lopez was not just a member of this violent gang, but he was a "homeboy" and served as a leader of the Sykos Locos Salvatrucha clique of MS-13. After the government's multi-year effort to combat MS-13 violence in Massachusetts decimated the gang between 2015 and 2017, Lopez helped mentor a new generation of gang members.

On July 30, 2018, Lopez and five of his younger clique members brought MS-13's senseless and horrifying violence to a public park in Lynn, Massachusetts, where they lured and murdered a teenage boy under the mistaken impression that he was cooperating with law enforcement. Lopez authorized the murder and drove the victim to the scene of his tragic death. At the scene, Lopez and five of his gang members (four of who were armed with knives and the fifth who was armed with a gun) surrounded the defenseless victim. Lopez—who was much taller and weighed three times as much as the victim—helped prevent the small, defenseless boy from escaping as the other MS-13 gang members brutally stabbed and hacked the victim to death.

Based on his role in the murder alone, Lopez's guideline sentence is life in prison.[1] If not for Lopez being the first defendant to plead guilty—which led the government to bind itself to a recommendation of 50 years—the government would have likely recommended life in prison for Lopez given his leadership role in the conspiracy and his role in the murder. As things stand, consistent with the plea agreement, the government recommends a sentence of ***50 years in prison***, a sentence that is fully supported by the factors outlined in 18 U.S.C. § 3553(a). A lower sentence (than this already below-guidelines sentence) would not reflect the seriousness of the offense, provide just punishment for the crime, promote respect for the law, or afford adequate deterrence.

---

[1] The presentence report prepared by the U.S. Probation Office, which is still being finalized at the time of this filing, adds a number of other enhancements and groups based on Lopez's relevant conduct. Given that the 2018 murder alone results in a maximum offense level of 43 and a maximum guideline of life in prison, the Court can likely sentence Lopez without needing to make additional findings about additional enhancements. The additional conduct mentioned in the presentence report does, however, provide relevant information for sentencing purposes because it shows that Lopez's participation in murder was anything but a lapse in judgment or deviation from an otherwise law-abiding lifestyle. To the contrary, Lopez's participation in murder was his latest show of dedication to the MS-13 gang and his commitment to violence.

**A.      Lopez's Guideline Sentencing Range is Life in Prison.**

As in every case, the Court must begin the sentencing process by calculating the offense level and guideline sentencing range applicable to Lopez.  In Lopez's case, the guideline calculation is relatively easy, and the plea agreement itself contains an agreement between the parties sufficient to show that Lopez's offense level is 43 and his guideline sentence is life in prison.  The Plea Agreement unequivocally states, "The parties agree that Defendant's total 'offense level' under the Guidelines is the maximum offense level of 43."  Plea Agreement, § 3.  Based on the murder alone, Lopez's offense level is well over the maximum offense level of 43.  As stated in section 3 of the Plea Agreement:

-      The base offense level is 43 because Lopez participated in first-degree murder.

-      There is a 4-level enhancement because Lopez was a leader in the enterprise.

-      There is a 2-level enhancement because Lopez used a minor in the offense.

-      There is a 2-level enhancement because the victim was unusually vulnerable.

Even after a reduction for acceptance of responsibility, the final offense level is 43 and the guideline sentence is life in prison.

**B.      The Government's Recommendation is Measured.**

Before turning to its recommendation, the government notes that Lopez has admitted to first-degree murder—a crime that would typically call for a sentence of life in prison in both state and federal court.  *See* M.G.L. ch. 265, § 2 ("[A]ny person who is found guilty of murder in the first degree *shall* be punished by imprisonment in the state prison for life and shall not be eligible for parole...") (emphasis added); U.S.S.G. § 2A1.1, Application Note 2 ("In the case of premeditated killing, *life imprisonment is the appropriate sentence* if a sentence of death is not imposed.  A *downward departure would not be appropriate* in such a case.") (emphasis added).

Further, as the Court is aware, in this case, Lopez and other participants in the July 2018 murder went through the Department of Justice's capital case review process because they could have also been charged with violating 18 U.S.C. § 1959(a)(1) (murder in aid of racketeering), a crime punishable by the death penalty.[2]  The government chose not to pursue a § 1959 charge.  However, if the government had done so, in the absence of pursuing a capital case, the only alternate penalty for that crime would have been a *mandatory* sentence of life in prison.  *See id.*

The government notes all of the above to respectfully submit that its charging decisions and sentencing recommendations in this case have been measured, and importantly, have already taken into account much of the contextual or mitigating information that Lopez will be putting forward at sentencing.  The government will further amplify the reasons for its sentencing recommendation at the sentencing hearing.  For now, the government summarizes how the 18 U.S.C. § 3553(a) sentencing factors support the government's recommendation and call for the Court to impose the recommended sentence.

**C.     <u>The Factors Outlined in 18 U.S.C. § 3553(a) Support the
Government's Recommended Sentence of 50 Years in Prison.</u>**

Each of the factors outlined in 18 U.S.C. § 3553(a), individually and especially in combination, support the government's recommended sentence.

---

[2]     The crime for which Lopez faces sentencing—racketeering conspiracy in violation of 18 U.S.C. § 1962(d)—is not eligible for the death penalty.  The reason that Lopez had to go through the Department of Justice's capital case review is that there was an alternate charge that the government could have pursued that was death eligible—murder in aid of racketeering in violation of 18 U.S.C. § 1959(a).

1. **The Nature and Circumstances of the Offense are Horrific, Troubling, and Support the Government's Recommendation.**

   A. **Racketeering Activity by Lopez.**

Before turning to the murder committed by Lopez, it is important to put the murder into context by recognizing his participation in the broader racketeering conspiracy. The July 2018 murder was not some random attack or heat-of-the-moment crime, but a brutal, senseless murder that is part of the infamous modus operandi of MS-13, one of the most violent gangs operating in the country. That is the prism through which the nature and circumstances of Lopez's crime must be viewed.

The First Circuit itself has noted the nature of this gang when affirming the sentences of various MS-13 members convicted of racketeering conspiracy in Massachusetts.

> The defendant is a member of La Mara Salvatrucha, a gang colloquially known as MS-13. MS-13 has gained notoriety for the brutality of its crimes and the relative youth of both its members and its victims. The gang's reach spans the Western Hemisphere: although its leadership remains in El Salvador, many of its regional and local branches, known respectively as "programs" and "cliques," are located throughout the United States. The web woven by MS-13 is so pervasive that the federal government often refers to the gang as a transnational criminal organization.
>
> Of particular pertinence here, MS-13 is quite active in the Boston area. Prominent MS-13 cliques exist in East Boston, Chelsea, Everett, Lynn, and Revere. ...
>
> The core purpose of MS-13 is to kill or maim rival gang members and collect money for MS-13's leadership.

*United States v. Gonzalez*, 981 F.3d 11, 14 (1st Cir. 2020) (affirming life in prison sentence for an MS-13 member convicted of RICO conspiracy and murder).

The core operating principles of MS-13—seemingly across cliques, across geographies, and across time periods—are the operating understanding that MS-13

members must try to murder gang rivals and those suspected of cooperating with law enforcement. *See* Indictment, ¶ 5 ("MS-13 cliques may have different leaders, chains of command, and areas of operation, but all MS-13 cliques share certain core operating principles, such as the need to attack rivals and those who cooperate with law enforcement against the gang."). *Compare with United States v. Perez-Vasquez*, 6 F.4th 180 (1st Cir. 2021):

> MS-13 has defined its primary mission as killing rivals, especially members of the 18th Street gang. If possible, a homeboy is supposed to kill a rival gang member, known as a "chavala," on sight. MS-13 members are also required to help out fellow gang members whenever they are asked.
>
> MS-13 members are forbidden from cooperating with law enforcement. A member who cooperates with law enforcement will have a "green light" put on him, which means he will be killed by other MS-13 members.

*Id.* at 187 (affirming life in prison sentence for an MS-13 member convicted of RICO conspiracy and murder).

MS-13's violence is so senseless, gruesome, and different from the typical criminal gang that, as the presentence report indicates, in 2012, MS-13 became the first street gang to be designated by the United States government as a "transnational criminal organization" or TCO.  In 2017, the President of the United States directed a whole-of-government approach to dismantle MS-13 and certain other high-priority TCOs. *See U.S. Department of Justice*, "Full Scale Response: A Report on the Department of Justice's Efforts to Combat MS-13 from 2016-2020," available online at *https://www.justice.gov/archives/ag/page/file/1329776/download*.  And in 2018, the Attorney General of the United States created the Transnational Organized Crime Task Force, specifically targeting five of the highest-priority TCOs in the world:  MS-13; Hezbollah; Sinaloa Cartel; Clan del Golfo; and Cartel de Jalisco Nueva Genaracion.  *Id.*

The government anticipates that Lopez and the other defendants will try to argue that they are not part of some organized, transnational, criminal organization but simply got caught up by circumstances in an unorganized, loose collection of local actors that had little to do with the broader MS-13 enterprise. To the extent they raise that argument, it would only show a fundamental misunderstanding of what makes MS-13 so dangerous and why this gang's violence requires a tough response. The fact that the defendants may have participated in what they view to be random, senseless, disorganized violence is an *aggravating* factor, not a mitigating factor. Put differently, it is a *more troubling* organization precisely because it often engages in such senseless and random violence. This is not a gang—unlike just about every other gang operating in the country—whose members are primarily motivated by money. This is a gang whose members are primarily motivated by a thirst for violence.

One of the most striking things about all of the MS-13 cases charged in Massachusetts in recent years is that out of the dozens of defendants charged with all types of violence, including defendants charged with murders and attempted murders, *none* of the defendants appear to have been primarily motivated by money. Stated differently, while the defendants will undoubtedly make much of the poor circumstances in which they were raised—a common theme across these cases—these are not defendants who committed violence based on economic motivations. Lopez and his fellow murderers were not out robbing people, extorting people, or defrauding people, or trying to leverage their crimes into expanding their territorial or economic control. Just like the other murderers recently charged in this district, they seem to have engaged in senseless violence for violence's sake. That is a far more troubling dynamic than even the typical case of gang violence, where gang members often engage in violence based on underlying

economic motivations, such as the need to increase territory or make money. Indeed, as further discussed below, Lopez actually had a *six-figure bank balance* in 2018 when he was supervising his younger clique members and encouraging them to commit violence.

The nature and circumstances of Lopez's crimes are troubling not because the murder he and his fellow clique members committed was senseless, horrific, and *atypical*, but because it was senseless, horrific, and *typical* of the violence associated with MS-13. Indeed, it is the typical modus operandi of this gang to lure out unsuspecting (often young) victims and brutally stab and hack them to death. Most of the murders charged in the *Recinos Garcia* case fell into the same modus operandi. "MS-13 has gained notoriety for the brutality of its crimes and the relative youth of both its members and its victims." *Gonzalez*, 981 F.3d at 14. Indeed, one of the reasons that the FBI and Massachusetts State Police were immediately called to the scene of the Rivas murder is that the nature and circumstances in which the body of Rivas was found led law enforcement to suspect that this was a possible MS-13 gang attack.

The Court must send the strongest message possible to MS-13 leaders like Lopez who participate in racketeering activity on behalf of such a violent, senseless gang, and who recruit and encourage young people to commit violence in such unconscionable ways. The fact that Lopez committed himself to a gang whose core tenets include targeting those who cooperate with law enforcement should only magnify the reasons to impose a lengthy sentence on Lopez.

### B. The July 2018 Murder.

Massachusetts law defines first-degree murder as, among other things, a murder committed with "extreme atrocity and cruelty." M.G.L. ch. 265, § 1. Lopez and his fellow gang members lured a young, small, impressionable, defenseless, teenager to a public

park in Lynn where they surrounded him, prevented him from escaping, and brutally stabbed and hacked the victim to death as he apparently begged for his life from those whom he believed to be his friends. If there was ever a murder that met the definition of a murder committed with "extreme atrocity and cruelty," it would be the murder of Herson Rivas committed by Lopez and his co-defendants.

Lopez's role in helping facilitate the murder is hard to overstate. To the extent an MS-13 leader needed to sign off on the murder and authorize it, the evidence indicates that Lopez did so in his capacity as the Second Word of the Sykos clique.[3] Like he did often in the weeks leading up to the murder, on the day of the murder, Lopez hung out with the five younger MS-13 members (along with his girlfriend and the girlfriend of Salvador), generally paying for what they needed and driving them around town in his new 2018 Honda SUV. In the hours leading up to the murder, Lopez paid for a room at the Knights Inn in Danvers, MA, where the group gathered and set up base for the night. After one of the murderers called Rivas and asked him to hang out (with the underlying motive of luring Rivas to his death), Lopez and the other five murderers left the two girls in the hotel room and went to go pick up Rivas in Lopez's SUV with Lopez at the wheel. Lopez picked Rivas up at the Wonderland station and then drove everyone to the Henry Avenue Park in Lynn.

Even prior to the horrific and senseless violence that was to follow, the circumstances of how Rivas was lured and driven to the scene of his death are haunting.

---

[3] Although there is some evidence of phone activity involving Duggins and Lopez in the leadup to the murder, the government does not have evidence showing that Duggins, as the First Word, authorized the murder. CW-24 and CW-27 both indicated that they understood Lopez to have authorized the murder and that approval from Duggins was not necessary because Lopez, the other leader of the clique, was present (and indeed participating in the actions) that day.

Based on his autopsy results, at the time of his death, Rivas was 17 years old, 5'6" tall, and only 115 pounds. He was invited to a park to smoke up with people whom he viewed as friends. Lopez picked Rivas up in his new SUV, and the group drove off towards Lynn. Rivas was crammed into Lopez's SUV with six other men (Lopez, Salvador, Vaquerano, Tercero, Reyes, and Maltez) believing that he was going to a wooded park to hang out with older boys who had taken an interest in him, blissfully unaware that armed murderers were driving him to his death making the events soon to follow a fait accompli.

At the scene, the group did not confront Rivas about their suspicions that he was cooperating with law enforcement or posing a threat to the gang. The decision had already been made by Lopez and the others that Rivas had to die for his perceived transgressions.[4] Without confronting Rivas, Lopez and the others surrounded and ambushed him in a brutal gangland attack. Again, the evidence paints a harrowing picture. Rivas – a mere 115 pounds – was surrounded by six men, many of whom were much bigger and stronger than him. Lopez's PSR indicates that he is 5'10" and 370 pounds. Vaquerano, who Salvador described as hacking Rivas to death, is described in his PSR as 6'1" and 300 pounds. Four of the murderers (Salvador, Vaquerano, Tercero, and Reyes) were armed with knives, while the fifth (Maltez) was armed with a gun that he planned to use to finish off Rivas if the knives did not complete the job.

---

[4] Even if Rivas had actually been cooperating against the gang, that would not, of course, justify the murder in any way, shape, or form. But here, Lopez and the others were not even correct about their suspicions nor did they so much as attempt to verify their mistaken belief before taking irreparably permanent action. Their conduct was done in cold blood. The government has no evidence that Rivas either participated in violence himself *or* that he was cooperating with law enforcement's investigation into other MS-13 members. Rivas was, by all accounts, a truly innocent victim.

When the group started attacking Rivas, he screamed for help from Vaquerano (Peligroso)—someone whom Rivas believed was his friend. Rivas then tried to run for his life, but Lopez (Maymbu) threw the victim to the ground and prevented Rivas from escaping, at which point Vaquerano, Salvador, and the others continued to stab and hack Rivas to death. In Perverso's chilling words:

> PERVERSO: ... That son of a bitch boy [Rivas] really loved PELIGROSO [Vaquerano].
>
> ...
>
> PERVERSO: *And that boy, dude, looked at PELIGROSO, because PELIGROSO was the one that had lured the boy out, and he was saying, "PELI, PELI, PELI, PELI, help me, PELI, PELI!" he cried out like that.* And the son of a bitch was going to run from us. "Bullshit, son of a bitch," he [Lopez] said, and he kicked him immediately and smacked him once in the ass, boom! He was down, dude!
>
> CW: *MAYIMBU [Lopez] smacked him?*
>
> PERVERSO: *Uh-huh, and the son of a bitch fell.* He sat down, like this. I had the knife in my hand, but the dude only had that one stab wound that the dude had stabbed him, dude. So I grabbed a stick and I knock him down.

Ex. 1, Oct. 24, 2018 Salvador Recording Tr., at pp. 21-22 (emphasis added).

Salvador then described in graphic detail how Vaquerano and others took turns stabbing the teenager to death with large knives or machetes:

> PERVERSO: Oh, dude, *so when I was about to go like this, dude, I see the dude, PELIGROSO, was already there, like he was chopping wood, the fucking dude, Bang! Bang! Bang! Bang! Bang! Bang! like that.* It was the knife he had, one of those son of a bitch knives. It was like this big, doggie. *It was about this big, and the fucking tip was like this, turned up, like this. Like the tip of a 'Tunca' [small machete in El Salvador] turned up.* The knife was like this big, like this big knife, like this, dude, in his big arms, the son of a bitch, UI. *And I, dog, I go and strike him in the ribs, dude! Bam!*

*Id*. at p. 23 (emphasis added).  In addition to describing how Peligroso [Vaquerano] was hacking the victim with a machete as if "chopping wood," Salvador also described how he [Perverso] stabbed the victim with such force that the knife he was using became warped. He also disturbingly described how Vaquerano similarly damaged his knife because he was striking the victim on the skull and was "dicing" the victim "as if he were a cow":

CW:         You stabbed him hard?

PERVERSO:   Yes. *Straight into his ribs, dude. And when I pulled out the knife, it was warped.  The son of a bitch was warped.*  Not just on the tip, but it came out kind of twisted.  It warped, the son of a bitch.

CW:         So, it warped when you UI [unintelligible].

PERVERSO:   When I stabbed him, it came out. *And PELIGROSO, dude, he was dicing him as if he were a cow, that fucker!  The knife PELIGROSO had, dude, looked like a saw now, dude.  It broke, the son of a bitch, on the cutting edge.  It was warped. Because he was hitting him right on the skull, Clang! Clang! Clang! Clang!* and he only had one knife cut here, and he had already stabbed him, and this dude, from the other side, had stabbed him like this.  *And PELIGROSO hitting him on the head, and the boy, the son of a bitch, was like "PELI, PELI, PELI, PELI, PELI, PELI!"*

*Id*. at pp. 23-24 (emphasis added).  Salvador also described how the victim tried to get up, but the murderers had him surrounded, further describing how he [Perverso], Vaquerano [Peligroso], Tercero [Desalmado], and Reyes [Silencio] took turns stabbing the victim to death:

CW:         And didn't the son of a bitch try to get up?

PERVERSO:   No, dude, how could he get up? *We had the son of a bitch surrounded. And he thought that PELI would UI, but he was the one that stabbed him the most times!*
            ...

PERVERSO:   *"PELI, PELI, PELI, PELI!," while the dude was laughing his head off, dude.  Because PELIGROSO was killing him.  And I*

*was stabbing him with the knife, dog. There where I was stabbing him, dude UI. DESALMADO and SILENCIO were stabbing the knife right through him, bringing it down like this, dude. Bang, bang, bang, bang!*

...

PERVERSO: He had that and was stabbing him here, but *the boy was covered in blood, and they stabbed him! [Bursts out laughing.]*

*... So the ones that stabbed him were me, PELIGROSO, DESALMADO, and SILENCIO, dude.* We were the ones that stabbed him, dude.

*Id.* at 24 (emphasis added). Unfortunately, Salvador's graphic descriptions of the murder were not mere braggadocio or exaggeration. Salvador's descriptions of the murder are consistent with how CW-24 had described the murder to investigators in the weeks *prior* to this jailhouse recording of Salvador.[5]

Having repeatedly stabbed and hacked the teenage boy to death, Lopez and the others then left Rivas's body to rot in the wooded jungle. The body was found by a passerby on August 2, 2018, mere days after the murder on July 30, 2018. Even though it had only been approximately three days, Rivas's face was all but unrecognizable from the injuries and decomposition. The crime scene photographs further show the cold-hearted nature of the murder and the callous way in which Lopez and the others left

---

[5]    In pretrial litigation in this case, the defendants fought hard to exclude the Salvador recording or minimize the import of Salvador's descriptions of this murder, trying to paint his words as unbelievable and Salvador as having mental defects. It is unclear if defendants will attempt to do the same at sentencing, but if they do, the Court should be aware that Salvador's descriptions of the murder (including his statements about the victim screaming "Peli Peli Peli" as Vaquerano started hacking at him with a large knife) are consistent with how CW-24 described the murder to investigators on October 11, 2018, two weeks *before* the Salvador recording. Salvador, of course, did not know that the government had already debriefed CW-24 and was investigating the murder when Salvador made similar incriminating statements to CW-13 on the jailhouse recording.

Rivas's body in the park. Attached as Ex. 4 and filed under seal given the graphic nature of the images and out of respect for the victim's family, are a few of the crime scene photos showing the scene where Rivas's body was discovered.

Lopez and the other murderers left Rivas in such a condition that he was utterly unrecognizable. The identity of the body had to be determined through fingerprints. Adding to the cruelty of the case and compounding the unimaginable loss suffered by Rivas's family, Rivas's casket had to be closed at his funeral given the nightmarish condition in which his body was found.

The autopsy report only further confirmed the nature and circumstances of the crime. Salvador's descriptions were not hyperbole. Rivas had dozens of sharp force trauma wounds to his body consistent with being stabbed. Attached as Ex. 5 are just a few sample photos from the autopsy of Rivas. Like the crime scene photographs, the small sampling of autopsy photographs is filed under seal to help preserve the dignity of the teenage victim who was murdered by Lopez and his co-defendants, and these are far from the most graphic images from the autopsy (and no images of the internal injuries have been included), but the pictures provide some insight into the harm caused by the defendants in this case.

Attached as Ex. 6 is the autopsy report of Rivas, which shows the significant trauma suffered by the victim. The descriptions of the injuries are shocking to the conscience and show the heinous nature of the crime. Rivas had numerous sharp force injuries to the head, numerous sharp force injuries to the neck, numerous sharp force injuries to the torso, and numerous sharp force injuries to the extremities. Rivas had at least *32* different sharp force trauma injuries to his body that were large enough to be measured and counted, along with blunt force injuries to the head.

Some of the sharp force wounds appeared to be attempts to slice his throat/neck. (For example, the autopsy report describes a "21 centimeter incised wound on the anterior neck" with "wound path directed from front to back" that not only perforated the skin but also "penetrated the anterior aspects of the second to fourth vertebrae"). Some of the sharp force wounds to his chest cut right through his ribs. For example, left rib #4 was "sheared in two" "consistent with sharp force (stabbing)." Some of the sharp force wounds to his head included small pieces of metal embedded in his skull (which appear consistent with a knife or machete slicing through his skull). The injuries to Rivas were so numerous and extensive that the Medical Examiner could not even depict all of the injuries on one page of the chart typically used to chart injuries:



See Ex. 6 at pp. 31-32.

The nature and circumstances of the murder, even when viewed in the abstract, are so gruesome and horrifying that they overwhelm almost any other sentencing factor given the need to hold Lopez and his co-defendants responsible for their horrific crime. When combined with the numerous aggravating factors present in this case—including the fact that the murder was committed on behalf of a transnational criminal gang dedicated to senseless violence, and the fact that Lopez and his fellow gang members targeted a perceived government witness (striking at the core of a functioning legal system)—the nature and circumstances of the offense only further support the government's recommended sentence.

**2. The History and Characteristics of the Defendant Support the Government's Recommended Sentence.**

The government also highlights some of the history and characteristics of the defendant that further support the government's recommended sentence.

To begin with, it is important to note that Lopez has a lengthy and troubling history with MS-13. He has demonstrated a longstanding commitment to violence, and he has long had an unquestioned fealty to this violent gang. By the time of his arrest in 2018, based on his own words, Lopez had spent a dozen years committed to the cause of MS-13. Indeed, to show his commitment to MS-13 and the Sykos Locos Salvatrucha or SLS clique of MS-13, Lopez has literally branded the name of his gang and his clique on his body:



Plenty can be said about a hardened gang leader who encourages teenagers to commit murder on behalf of the gang, but some of the most damning information about Lopez's history comes from Lopez's own words. Law enforcement has two historical recordings of Lopez that show his longstanding and sincere commitment to MS-13 and the gang's violent mission.[6] The first recording is an April 2015 recording made by CW-1, the main cooperating witness whose efforts led to the *Recinos Garcia* case. An excerpted transcript of that recording is attached as Ex. 2. On this recording, Lopez admits to his membership and leadership of the Sykos clique, provides background on himself and the Sykos clique, and makes admissions about the MS-13 enterprise and the pattern of racketeering activity associated with the group. Among other things, Lopez not only talks about the need to commit violence and murder, but he also states that a murder committed in the United States counts a lot more in terms of prestige than a murder committed in El Salvador. *See, e.g.*, *id*. at p. 9 (stating that "Killing a chapeta up here is like killing twenty chapetas down below…").

Lopez also states that he was jumped in (fully promoted) as a homeboy in MS-13 back in 2006 and indicates that he has been engaging in activity in Massachusetts on behalf of the gang since then (an admission that provided the basis for the 2006 starting date listed in the conspiracy count charged in the Indictment):

---

[6] Given these recordings, the Court can assume that Lopez had been on law enforcement's radar for a number of years prior to his arrest in 2018. However, the government had not been able to develop proof beyond a reasonable doubt of Lopez's participation in racketeering activity, leaving open the possibility that Lopez would claim that his words on these recordings were simply bravado or hyperbole. (Even now, as part of the presentence process, Lopez seems to be advancing the argument that the words on these recordings cannot be taken at face value.) Unfortunately, as the subsequent events of July 2018 tragically showed, Lopez did indeed have a commitment to MS-13's quest for violence and there is plenty of reason to believe that Lopez is accurately describing his longstanding knowledge and intent regarding MS-13 on these recordings.

| MAYIMBU: | Look, I can't say I'm one of the old guys, but I was jumped in back in 2006, dude. Since 2006, dude, who knows how many chapetas I have gotten, dude. |
|---|---|
| CW-1: | Especially right here in the same state. You've been doing it in the same state. |
| MAYIMBU: | Exactly. |

*Id.* at p. 9.

In other parts of the recording, Lopez further showed his commitment to the Sykos clique, referring admirably to Duggins (who was then in jail for an attempted murder committed on behalf of the gang) and stating, "That dude [Duggins] has represented the Syko Locotes, dude, that's why I tell the Syko Locotes, 'I will never change my name, no matter what happens. No matter what happens. I will always be ...[SLS].'" *Id.* at p. 13. Lopez goes on to describe how he and Duggins [Haze] took over the Sykos clique starting in 2006 when he became a homeboy:

| MAYIMBU: | That's the thing. We, in 2006 and the years when I was born in Barrio, that's when the clique got going, dude. Because before, when the clique was here in Lynn, dude, before... without being disrespectful, but we didn't have garbage, dude. Over here, the representatives we had previously, dude, would not stand up for us. They allowed the Dominicacas come and shit on us. That's why, since I was jumped in, dude, HAZE and a culera garbage that used to be called Chris, we took over the clique. We took over the clique. |
|---|---|
| CW-1: | That's awesome. |
| MAYIMBU: | And now, all this pride, man, in Lynn, comes to us. We were the ones that raised up the clique. Before, we got no respect, nothing. We were buried. |
| CW-1: | And now... |
| MAYIMBU: | And now, I'm telling you. Any son of a bitch from Lynn can tell you who the four of us are. We are DELINCUENTE, the one we just dropped off; SHADOW, HAZE and me. |

*Id.* at p. 14.

At various parts of the recording, Lopez also discussed other MS-13 members operating in the area, again demonstrating his knowledge and intent about the conspiracy and the pattern of racketeering activity by the gang. Among others, Lopez mentioned "Little Crazy" (Jose Vasquez, the leader of the Trece Locos clique, who was subsequently charged with racketeering in 2016), "Terrible" (German Hernandez Escobar, the leader of the Everett Locos clique, who was subsequently charged with racketeering in 2016), and "Innocente" (Jose Rene Andrade, a member of the Everett clique, who was subsequently charged with racketeering in 2016). It is clear from these discussions that Lopez is a longstanding, established MS-13 member in Massachusetts, he frequently interacted with MS-13 members from other local cliques, and this is just one of the many reasons why the Probation Office has correctly identified the *Recinos Garcia* case as a related case. The evidence indicates that many of the defendants in that case were co-conspirators of Lopez at some point during the period of the charged conspiracy.

In addition to discussing the key MS-13 principle of violence against rival gang members, Lopez also discussed the key MS-13 principle of violence against those who cooperate with law enforcement. Among other things, Lopez stated that he told "Scooby" from the Hollywood clique to be careful because he was in love with a girl who might be a snitch. Lopez stated, "I'm going to kill her, man, because I'm not going to allow any fucking girl to come and snitch on a dude." *Id.* at 4. These types of comments seem entirely consistent with the actions that the presentence report indicates that Lopez took vis-à-vis the murder of Blanca Lainez in 2016 and the murder of Herson Rivas in 2018.

A December 2017 recording made by CW-17 provided additional information from Lopez, in his own words, about the history of the Sykos clique. A draft transcript of that recording is attached as Ex. 3. Lopez again confirmed that he had been a homeboy in MS-

13 since 2006, stating that he joined the Sykos clique in Lynn along with co-defendant Duggins [Haze], even though another clique named the East Sides also wanted Duggins and Lopez:

> TRISTE:     What year did you get jumped in?
>
> MAYIMBU:   I was jumped in in 2006, but I came here in 2002. I started out with that dude, I met CASPER. CASPER wanted me to join the East Sides, but I became Sykos, because I thought, "Dude, I live in Lynn. There's a clique in Lynn. I'm going to join something in Lynn." And I went with the Sykos. CASPER was furious. He really wanted me to join East Side. HAZE too, dude. The East Sides also wanted HAZE, dude….

*Id.* at p. 23-24.

The December 2017 recording is also highly relevant for one other critical reason—this recording leaves no doubt that Lopez was acutely aware of law enforcement's takedowns and targeting of MS-13 members across Massachusetts during those years, a fact noted by even the courts. *See, e.g.*, *United States v. Lopez*, 957 F.3d 302 (1st Cir. 2020) ("The backdrop of this sentencing appeal is the government's relentless pursuit of a notorious criminal gang, famously known as MS-13.") (affirming a statutory maximum sentence of 240 months imposed on an MS-13 member who pled guilty—the same sentence the government intends to seek against co-defendant Duggins).  On the recording, Lopez mentioned how MS-13 used to have a significant presence in numerous communities across Boston, but that changed after law enforcement infiltrated the gang, caught gang members on tape, and arrested numerous members.  Lopez lamented how the gang had been decimated, noting it was time for another generation to build the gang back up:

> MAYIMBU:   That's what I advised the dudes, especially the Everett's dude. I used to tell them, "Don't talk too much about that stuff on the phone. I respect the rules and everything, but too much

|          |                                                                                                    |
|----------|----------------------------------------------------------------------------------------------------|
| | information is what happened. Because we were fine, dude. We were fine. We were damned! |
| CW-17: | Yes. |
| MAYIMBU: | And now look how we are! Ley! I'm not saying anything bad, but we aren't a lot of dudes. You don't see a lot of dudes in the street now. Before, wherever you looked, there would be at least one dude. There was always a dude around. But now, fuck. One dude, what the fuck, five, seven dudes! We're not anything, dude! ... Now it's you guys' turn. Dude, I survived three generations, dude.... |

*Id.* at p. 21.

Lopez was apparently so keenly aware of the prior series of MS-13 prosecutions and the *Recinos Garcia* case that when law enforcement obtained a warrant to search Lopez's phone after his arrest, the phone analysis showed that Lopez had only two PDF documents saved on his phone—and one of them was the *2016 indictment from the Recinos Garcia case.*

These facts provide at least three aggravating factors when it comes to the "history and characteristics" of the defendant and further compelling arguments that the sentence recommended by the government is appropriate:

*First*, these facts show that Lopez had a longstanding commitment to a dangerous gang whose core organizing principle was violence.  Indeed, by his own admissions, Lopez has pretty much spent his entire adult life committed to MS-13.  There can simply be no credible argument that anything Lopez did in 2018 was the result of some recent circumstances or near-term lack of judgment.  The 2018 murder was simply the culmination of an adult life committed to the ethos of Mara Salvatrucha.

*Second*, these facts show that instead of being thankful that he had been given a lifeline and somehow escaped the prior series of MS-13 prosecutions that had decimated

the gang, Lopez's takeaway was not to distance himself from the gang but to recommit himself to help reconstitute the gang. That is a damning indictment on his state of mind, outlook on life, and any prospects for rehabilitation. Lopez's reaction to an entire generation of violent MS-13 members being wiped out was to help lead the next generation of violent MS-13 members.

*Third*, and relatedly, these facts show that the sentences imposed in the *Recinos Garcia* case were plainly insufficient to deter Lopez (and his co-defendants) from continuing their quest for extreme violence.

Lastly, the government is compelled to comment on Lopez's financial history, which further serves as an aggravating factor in this case. As the PSR notes, Lopez became the recipient of a six-figure settlement arising from an accident in which he was severely hurt. The government undertook an investigation into what Lopez did with his settlement money, which revealed other galling facts about Lopez's history and characteristics. The investigation revealed that Lopez had almost no money to his name in February 2018, with a bank balance showing less than $100. That month, Lopez received a settlement totaling over $100,000. Lopez did not exactly treat this money as yet another lifeline to pursue a law-abiding lifestyle. Instead, Lopez deposited the money into his account, and immediately took out $40,000, most of which went towards the purchase of a 2018 Honda SUV—the same vehicle that would serve as the transportation to lure Herson Rivas to his untimely death and serve as the means of transportation for Lopez and his band of murderers:

**Your SafeBalance Banking**

for February 23, 2018 to March 26, 2018

**ERICK A LOPEZ**

## Account summary

| | |
|---|---|
| Beginning balance on February 23, 2018 | $69.27 |
| Deposits and other additions | 104,461.77 |
| ATM and debit card subtractions | -1,424.97 |
| Other subtractions | -40,000.00 |
| Service fees | -4.95 |
| **Ending balance on March 26, 2018** | **$63,101.12** |

The banking records show a constant stream of withdrawals and debit card transactions in the ensuing months, including numerous stays in hotel rooms where cooperating witnesses said Lopez would take the younger Sykos clique members and spend nights discussing MS-13 gang activities, watching MS-13 recruitment and promotion videos, smoking marijuana, playing video games, etc. Evidence from the phones of the defendants included multiple photographs of Lopez and various co-conspirators making MS-13 gang signs and showing their commitment to the cause:



From left to right: Tercero, [name withheld], Lopez, Maltez, Reyes, and Vaquerano.

Perhaps serving as a microcosm for the downward spiral that culminated in the murder of Rivas, the bank records show that by the time of the murder, in just a few months, Lopez's bank balance had dwindled from six figures back to less than $100:

**Your SafeBalance Banking**

for July 26, 2018 to August 27, 2018

**ERICK A LOPEZ**

## Account summary

| | |
|---|---|
| Beginning balance on July 26, 2018 | $3,174.97 |
| Deposits and other additions | 0.00 |
| ATM and debit card subtractions | -3,082.95 |
| Other subtractions | -0.00 |
| Service fees | -9.95 |
| **Ending balance on August 27, 2018** | **$82.07** |

Information provided by cooperating witnesses further showed how Lopez would spend on MS-13 related activities. For example, one cooperator stated that Lopez bought a tattoo kit to help Sykos clique members get tattoos, and he would even buy MS-13 related hats and clothes for his fellow gang members. The search of Lopez's residence following his arrest corroborated many of these accounts. For example, at Lopez's residence, the FBI uncovered a tattoo kit as well as a stencil of a tattoo that perfectly matched the tattoo on co-defendant Salvador's chest. CW-24 later told investigators that he used this tattoo kit from Lopez's house to give Salvador this tattoo:



Separately, at the search of Vaquerano's house, agents found a soccer style MS-13 jersey that literally had Vaquerano's gang name on it.  CW-24 later told investigators that he had a similar jersey that was also paid for by Lopez:



Lopez demonstrated his commitment to MS-13 long before he had some money to his name.  But even with money to his name, a girlfriend whom he apparently cared for, and a slew of MS-13 arrests resulting in lengthy prison sentences, Lopez remained steadfast and undeterred in his commitment to MS-13.  Again, if not for his decision to plead guilty, the government would almost assuredly have sought (and the § 3553 factors would have called for) a life sentence for Lopez.

### 3. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense All Support the Government's Recommended Sentence.

The other § 3553 factors all similarly support the government's recommendation.  Simply put, it is hard to imagine a crime more serious, more in need of just punishment, and more of a threat to our governing norms and legal system than the horrific murder of a teenage boy who is lured to a public park and repeatedly stabbed to death because a violent criminal gang is under the belief that the victim may be assisting law enforcement.

Thankfully, unlike in El Salvador, the murder of a suspected witness is still a relatively rare occurrence in the United States.  Troublingly, however, the murder of a

suspected witness is apparently a core tenet of MS-13, not just in El Salvador, but increasingly in the United States. That is simply not a principle that should be allowed to gain any foothold, and it is a deeply troubling factor that must be responded to in the strongest possible way. The Court's sentence should in no uncertain terms send a message to Lopez and his fellow defendants, as well as the broader community, about how serious the Court finds this crime and the broader racketeering activity of MS-13.

This case, in fact, has numerous aggravating factors that strike at the core of the social compact of our society. MS-13 is a gang that routinely recruits teenagers, that preys on vulnerable juveniles in our local high schools, that promotes a culture of violence and encourages young men to commit senseless murder, etc. It is unfathomable that in our public schools, there is a danger that students can be recruited into (or targeted by) a murderous gang that promotes violence and where the ultimate way to gain status is to commit a brutal murder.

The story of Herson Rivas itself is one filled with irony and tragedy. He was a young boy who grew up in El Salvador, where he was left behind by his mother so she could come to the United States first to try establishing a better life for her family. Once she established herself here with her two younger children, the family scrounged together whatever money it could to help Rivas (the oldest of the three children) come to the United States so that he could escape the gang violence that was ravaging El Salvador. After years of struggle, Rivas's family was able to pay someone to bring Rivas to the United States to join his family in making a better life for himself. Rivas rejoined his mother and siblings, started attending the local public high school, and took his first steps towards the American dream.



And then, his life was tragically and horrifically cut short when he was lured to a wooded area and stabbed and hacked to death—not in the jungles of El Salvador, but in a public park in Lynn. It is difficult to articulate the anguish, heartbreak, and devastation suffered by Rivas's family, and his mother and two younger siblings in particular.

Lopez's leadership of a murderous clique, when combined with his personal participation in the horrific murder of Rivas, call for him to spend most of the rest of his life in prison. The undisputed facts about his leadership role and role in the murder alone call for the government's recommended sentence. The other facts in the PSR only hammer home the point. For example, Lopez apparently had a role in—or at the very least, had knowledge of and implicitly approved—the murder of a teenage girl named Blanca Lainez. Moreover, Lopez apparently continued his commitment to MS-13 after his arrest, talking to Duggins and others at Wyatt about the need to retaliate against the witness who made the recording of Salvador in prison.

The sentence imposed on Lopez must reflect the seriousness of the offense, provide just punishment, and promote respect for the law. In this case, a sentence of 50 years in custody would still be a below-guidelines sentence for a defendant whose conduct would typically have called for anything but a below-guidelines sentence (and who, but for a discretionary charging decision, could arguably have faced a mandatory sentence of life in prison, if not a potential capital case).

### 4. The Need to Afford Adequate Deterrence Further Supports the Government's Recommended Sentence.

The Court's sentence must also appropriately focus on individual accountability and promote general deterrence. The government does not minimize the fact that the defendants in this case (and unfortunately, far too many people in our society) have various socio-economic, mental health, and other challenges. However, the overwhelming majority of people suffering from those challenges—even if they come from traumatic backgrounds in places like El Salvador—do not resort to a life of crime, let alone a life of such extreme violence.

It is imperative that the Court send a message with the sentences in this case that the type of brutal, senseless violence unleashed by Lopez and his fellow MS-13 members will not be tolerated and will receive the highest attention of law enforcement and the highest attention of this Court. Even associating with a gang like MS-13—a gang where violence permeates every part of the gang from recruitment to promotion—should not be tolerated and should be deterred in the strongest terms. Here, of course, Lopez and his co-defendants did a lot more than simply associate themselves with a violent criminal enterprise.

The government anticipates that Lopez and his co-defendants will try pointing to some lower sentences around the country in the hope that they receive significant sentencing leniency from this Court. The government will respond to those arguments once received, but for now, the government simply notes that it is clear that even the sentences imposed in the *Recinos Garcia* case—which each of the defendants here appear to have had at least some familiarity with—plainly did not deter these MS-13 members from committing themselves to the cause of MS-13 and committing murder in furtherance of that cause.

### 5. The Need to Avoid Unwarranted Sentencing Disparities Further Supports the Government's Recommended Sentence.

Finally, to the extent the Court is interested in knowing how Lopez fits within the spectrum of the dozens of MS-13 members convicted and sentenced in Massachusetts in recent years, the government notes that its recommended sentence of 50 years for Lopez is also calibrated to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1)(6).

Notably, in the related case of *United States v. Recinos Garcia et al.*, 15-10338-FDS, a case in which over 50 defendants have been convicted to date and where approximately fifteen defendants have been found responsible for murder being reasonably foreseeable to them, the government cannot recall a single defendant who was *both* (i) a leader of an MS-13 clique, *and* (ii) someone who was present at the scene and personally participated in a murder. The murderers convicted in that case—who often engaged in the same type of horrific violence seen in this case and who stabbed and hacked victims to death, or in the rare case, shot a victim to death—were generally younger members of the gang (like Salvador, Vaquerano, Tercero, and Reyes in this case).

The older leaders of the cliques who ordered the murders generally were not present at the scene of the murder. Lopez presents as the rare MS-13 defendant who not only rose through the ranks to become a leader, but who also personally participated in luring and killing a victim.

The defendant in prior cases who was most similarly situated to Lopez was Noe Perez Vazquez a/k/a "Crazy," defendant number 4 in 15-cr-10338. Perez Vazquez was a leader of a clique who was also held responsible for one or more murders, he was convicted at trial, and he was sentenced to *life in prison*. His conviction was recently affirmed by the First Circuit in *United States v. Perez Vasquez*, 6 F. 4th 180 (1st Cir. 2021).

Although the facts and circumstances of the cases are different, some of the similarities between Lopez and Perez Vasquez are striking. Like Lopez, who was the "Second Word" of the Sykos clique, Perez Vasquez "claimed to be the second in command of the Everett Locos Salvatrucha clique." 6 F.4th at 181. Like Lopez, who helped orchestrate the murder of a teenager named Herson Rivas or "Smiley" based on the gang's belief that Rivas may have been cooperating with law enforcement, Perez Vasquez helped orchestrate the murder of a teenager named Jose Villanueva or "Fantasma" based on the gang's belief that Villanueva may have been cooperating with law enforcement. *Id.* at 188. Like Lopez, "the Probation Office calculated Perez Vasquez's advisory guidelines sentence as life imprisonment based on an offense level … revised downward to the maximum offense level of 43 and a criminal history category of IV." *Id.* at 92.

There are some other similarities as well, but for present purposes, the point is that the most similarly situated defendant as Lopez to have been sentenced in recent years in Massachusetts received life in prison. If Lopez had proceeded to trial, the government would almost assuredly have similarly sought a sentence of life in prison. Given Lopez's

guilty plea, the government respectfully seeks a sentence of 50 years, which would also help avoid unwarranted sentencing disparities with similarly situated defendants found responsible for similar conduct. Lopez presents as the rare MS-13 member who did not even "age out" from personally participating in extreme violence as he grew older. His leadership role combined with his personal participation in murder call for the type of sentence recommended by the government.

## <u>CONCLUSION</u>

For the reasons stated in this sentencing memorandum and those to be advanced at the sentencing hearing of Lopez, the government respectfully requests that the Court sentence Lopez to 50 years (600 months) in custody, to be followed by 5 years of supervised release.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: /s/ Kunal Pasricha
KUNAL PASRICHA
KAITLIN R. O'DONNELL
Assistant United States Attorneys
District of Massachusetts

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By: /s/ Kunal Pasricha
KUNAL PASRICHA
Assistant United States Attorney
District of Massachusetts